IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CINEMA PUB, L.L.C., d/b/a BREWVIES,<br><br>Plaintiff,<br>v.<br><br>SALVADOR D. PETILOS, Director; CADE MEIER, Deputy Director; NINA MCDERMOTT, Director of Compliance, Licensing Enforcement, Utah Department of Alcoholic Beverage Control, in their official capacities; JOHN T. NIELSEN, Chairman; JEFFREY WRIGHT; KATHLEEN MCCONKIE COLLINWOOD; OLIVIA VELA AGRAZ; STEVEN B. BATEMAN; S. NEAL BERUBE; AMANDA SMITH, Members, Utah Alcoholic Beverage Control Commission, in their official capacities,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [44] DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS AND DENYING [45] PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY**<br><br><br>Case No.2:16-cv-00318-DN<br><br>District Judge David Nuffer |

Plaintiff Cinema Pub and defendants filed motions to exclude each other's experts.[1] In general, all the experts were asked to offer opinions related to the defendants' anticipated argument that the statute in question is not unconstitutional because it is intended to avoid the negative secondary effects that flow from showing certain images. Defendants' motion is GRANTED, but Cinema Pub's motion is DENIED.

---

[1] Defendants' Motion to Exclude Expert Opinions and Supporting Memorandum (Defendants' Motion), docket no. 44, filed January 27, 2017; Plaintiff's Motion to Exclude the Expert Testimony of Dr. William George (Cinema Pub's Motion), docket no. 45, filed January 27, 2017.

**Table of Contents**

Nature of Issues in this Case ................................................................................................ 2
    Motions Presented ............................................................................................................ 4
Discussion ............................................................................................................................. 5
    1.    Bishop's report and opinion is excluded ........................................................... 7
        a.    Bishop is not qualified to testify regarding secondary effects, but he is qualified to testify regarding *Deadpool*'s tone, content, artistic value, or comedic message. ................................................................................... 9
        b.    Bishop's opinions related to value or obscenity are not reliable. ............ 10
    2.    Parker's report and opinion is excluded in part. ............................................. 11
        a.    Parker is qualified to testify regarding secondary effects. ...................... 12
        b.    Parker's report is not reliable. ................................................................. 13
    3.    George's testimony is not excluded. ................................................................ 14
        a.    George is qualified to testify regarding relevant secondary effects. ......... 15
        b.    George's methods are reliable. ................................................................. 16
        c.    George's opinions are relevant. ................................................................ 16
    4.    Linz's supplemental report is excluded. .......................................................... 17
Order ................................................................................................................................. 19

## NATURE OF ISSUES IN THIS CASE

This action stems from defendants' agency action taken under Utah Code § 32B-1-504 against Cinema Pub, d/b/a Brewvies, for showing the movie *Deadpool*. Cinema Pub seeks declaratory and injunctive relief from the enforcement of Utah Code § 32B-1-504.[2] In relevant part, Section 32B-1-504 states

> The following attire and conduct on premises or at an event regulated by the commission under this title are considered contrary to the public health, peace, safety, welfare, and morals, and are prohibited: . . . .
> (7) showing a film, still picture, electronic reproduction, or other visual reproduction depicting:
>     (a) an act or simulated act of:
>         (i) sexual intercourse;
>         (ii) masturbation;
>         (iii) sodomy;
>         (iv) bestiality;
>         (v) oral copulation;
>         (vi) flagellation; or
>         (vii) a sexual act that is prohibited by Utah law;

---

[2] Complaint ¶¶ 20–31, docket no. 1, filed April 19, 2016.

(b) a person being touched, caressed, or fondled on the breast, buttocks, anus, or genitals;
(c) a scene wherein an artificial device or inanimate object is employed to depict, or a drawing is employed to portray, an act prohibited by this section; or
(d) a scene wherein a person displays the genitals or anus.

Cinema Pub alleges that the defendants violated their First Amendment rights of freedom of speech by enforcing Section 32B-1-504.[3]

In *City of Renton v. Playtime Theatres, Inc.*,[4] the Supreme Court carved out a narrow exception from the Constitution's generally unlimited protection of free speech. The Court (as clarified by the 10th Circuit[5]) determined that if a statute or regulation "merely aimed to impose time, place, or manner restrictions on account of [a] theaters' 'secondary effects,' meaning effects other than communicative impact on the audience," the statute or regulation is valid.[6] A statute or regulation attempts to mitigate secondary effects when, "by its terms[, it] is designed to prevent crime protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life, not to suppress the expression of unpopular views."[7] If the regulation is intended to mitigate these secondary effects, intermediate scrutiny is the appropriate standard.[8] The Court stated the standard for intermediate scrutiny in *United States v. O'Brien*:[9]

---

[3] *Id.* ¶ 7.

[4] 475 U.S. 41 (1986).

[5] *Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003).

[6] *Id.* at 1193.

[7] *Id.* quoting *City or Renton*, 475 U.S. at 48.

[8] If it is later determined that Section 32B-1-504 is a content-based regulation, strict scrutiny will apply. *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815 (2000) ("We have made clear that the lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content-based regulations targeting the primary effects of protected speech."). If strict scrutiny applies, the question is whether the regulation is "narrowly tailored to promote a compelling governmental interest." *Id.* at 813.

[9] 391 U.S. 367 (1968).

[A] government regulation is sufficiently justified if it is [1] within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[10]

The secondary effects listed above may establish the important or substantial governmental interest required under the second part of the four-part *O'Brien* test for validity of restrictions on speech.

## Motions Presented

Defendants move to exclude Dr. Kyle Bishop's report and opinions, Bruce Parker's report and opinions, and Dr. Daniel Linz's supplemental report.[11] Bishop was asked "to render [his] expert assessment of the film *Deadpool* . . . in terms of its alleged obscene content, its artistic/literary value, and its potential to elicit 'negative secondary effects' when viewed by those consuming alcohol."[12] Parker was asked to direct his opinion "at identifying any negative secondary effects resulting from Cinema Pub . . . serving alcohol to customers while screening G, PG, PG-13, and R-rated movies that may violate Utah Code §32B-1-504(7)."[13] And Linz's supplemental report was allegedly provided to give "further information regarding the secondary effects issues relevant" to this case.[14] Plaintiff Cinema Pub responded in opposition.[15] Defendants replied in support of their motion.[16]

---

[10] *Id.* at 377.

[11] Defendants' Motion.

[12] Bishop Report at 1, docket no. 36-1, filed October 31, 2016.

[13] Parker Report at 2, docket no. 36-3, filed October 31, 2016.

[14] Supplemental Report by Daniel Linz, PhD at 1, docket no. 43-1, filed December 30, 2016.

[15] Plaintiff's Memorandum in Opposition to Defendants' Motion to Exclude Expert Opinions (Cinema Pub's Opposition), docket no. 50, filed February 10, 2017.

[16] Reply Memorandum in Support of Defendants' Motion to Exclude Expert Opinions (Defendants' Reply), docket no. 53, filed February 24, 2017.

Cinema Pub moves to exclude Dr. William H. George's testimony.[17] George opined on "[w]hat is understood—scientifically speaking—to be the nature of the relationship between alcohol consumption and exposure to sexual content[; whether] joint exposure to both alcohol consumption and sexual content foster or contribute to the occurrence of adverse secondary effects[; and whether] the former (what is understood scientifically about the alcohol-sexuality link) inform the latter (joint alcohol-sex exposure and adverse secondary effects)."[18] Defendants responded in opposition.[19] Cinema Pub replied in support of its motion.[20]

For the reasons stated below, Defendants' Motion is GRANTED and Cinema Pub's Motion is DENIED.

## DISCUSSION

Federal Rule of Evidence 702 addresses the standard for the admissibility of expert testimony.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[21]

"Under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[22] The inquiry of scientific reliability is

---

[17] Plaintiff's Motion.

[18] Expert Report of William H. George, Ph.D. at 1, docket no. 37-1, filed October 31, 2016.

[19] Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Expert Testimony (Defendants' Opposition), docket no. 49, filed February 10, 2017.

[20] Reply Memorandum in Support of Plaintiff's Motion to Exclude the Expert Testimony of Dr. William George (Cinema Pub's Reply), docket no. 52, filed February 22, 2017.

[21] Fed. R. Evid. 702

[22] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

flexible and focuses on principles and methodology.[23] The Supreme Court has offered several non-exhaustive factors that a court may rely on for determining reliability such as, whether the testimony can be tested, has been peer reviewed, has a known or potential rate of error, and has attracted acceptance in the relevant scientific community.[24]

District courts are tasked with the responsibility of serving as the gatekeepers of expert evidence, and must therefore decide which experts may testify and present evidence before the jury.[25] Courts are given "broad latitude" in deciding "how to determine reliability" and in making the "ultimate reliability determination."[26] The Federal Rules of Evidence, however, generally favor the admissibility of expert testimony.[27] Excluding expert testimony is the exception rather than the rule,[28] and often times the appropriate means of attacking shaky but admissible evidence is through vigorous cross-examination, and the presentation of contrary evidence.[29] "[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and [courts'] role as gatekeeper is not intended to serve as a replacement for the adversary system."[30]

The inquiry into whether an expert's testimony is reliable is not whether the expert has a general expertise in the relevant field, but whether the expert has sufficient specialized knowledge to assist jurors in deciding the particular issues before the court.[31]

---

[23] *See Id.* at 595

[24] *See Id.*

[25] *See* Id. at 579.

[26] *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999), (citing *General Electric Co. v. Joiner*, 522 U.S. 135 (1997)).

[27] *See Daubert*, 509 U.S. at 588.

[28] *See* Fed. R. Evid. 702 Advisory Notes

[29] *See Daubert*, 509 U.S. at 596.

[30] *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010).

[31] *Kuhmo*, 526 U.S. at 156.

Expert testimony is subject to Federal Rule of Evidence 403. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[32]

In determining whether expert testimony is admissible the first step is to determine whether the expert is qualified, and then if the expert is qualified determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology.[33] If the expert is qualified and the opinion reliable, the subject of the opinion must be relevant; i.e. the opinion must "help the trier of fact to understand the evidence or to determine a fact *in issue*."[34] "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[35]

### 1. Bishop's report and opinion is excluded.

Bishop's report supports three opinions:

It is my opinion as an expert in popular culture and film that Deadpool
1. is not obscene, nor should it be considered pornographic or even "adult entertainment," as demonstrated by its having received an "R" rating from the Motion Picture Association of America (MPAA) (a "restricted" film, but one nonetheless accessible to viewers under 17 if accompanied by an adult parent or guardian) and its being a comedic, action-adventure movie;
2. has literary and artistic merit, thus offering the film Constitutional protection as an example of "free speech" as described in the First Amendment; and
3. would not directly encourage any of its viewers to threaten the health, peace, safety, welfare, or morals of the community, whether screened while consuming alcoholic beverages or not.[36]

---

[32] Fed. R. Evid. 403

[33] *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

[34] Fed. R. Evid. 702 (emphasis added).

[35] *Daubert*, 509 U.S. at 591.

[36] Bishop Report at 5.

Defendants argue that Bishop's report and opinion[37] should be excluded because, as an English professor, he "is not qualified to opine that viewing *Deadpool* and consuming alcohol would not lead to negative secondary effects."[38] To be qualified to make those opinions, defendants argue, Bishop would need to be "a psychologist, criminologist, or statistician."[39] Additionally, defendants argue that Bishop's opinion is not reliable because he does not support his opinions with anything other than "his assumptions."[40] And finally, defendants argue that Bishop's report and opinion on whether the movie is obscene "as the term has been defined by the courts"[41]should be excluded as unnecessary.

Cinema Pub responds that Bishop "is qualified to opine regarding the tone, content and artistic value of *Deadpool*, and particularly, the comedic intent of the messages conveyed in the scenes that Defendants allege violate" the implicated Utah statute.[42] Regarding Bishop's qualifications for opining on the "lack of negative secondary effects resulting from viewing *Deadpool*,"[43] Cinema Pub seems to concede that Bishop lacks expertise to opine on secondary effects as defined by case law.[44] However, Cinema Pub argues that Bishop is qualified to opine on the primary "communicative impact on the *audience* from viewing the sexual content in *Deadpool* while drinking alcohol."[45] This testimony is necessary, Cinema Pub argues, because the defendants' expert witness George implicitly makes this an "obscenity" case by "opining that

---

[37] Bishop Report, docket no. 36-1, filed October 31, 2016.

[38] Defendants' Motion at 4.

[39] *Id.*

[40] *Id.* at 5.

[41] *Id.*

[42] Cinema Pub's Opposition at 2.

[43] *Id.* at 3.

[44] *Id.*

[45] *Id.* (emphasis in original).

certain scenes in *Deadpool* appeal to the viewer's prurient interest."[46] Regarding his methods, Bishop states that he "look[s] at narrative works of fiction very closely, taking both formalist approaches . . . and more theoretical approaches . . . to try to discern what those texts say, tell, or teach about the society that produced them."[47]

### a. Bishop is not qualified to testify regarding secondary effects, but he is qualified to testify regarding *Deadpool*'s tone, content, artistic value, or comedic message.

Bishop has a B.A., M.A., and Ph.D.; all three degrees are based in the humanities.[48] Bishop's master's thesis "addressed the social and cultural value of film comedies."[49] And his dissertation "explored the cultural history of zombie films and argued for the social value of such narratives."[50] Bishop is currently "the Director of the Honors Program and an associate professor of English literature and film at Southern Utah University."[51] From 2004 to the present, Bishop has published many articles and book chapters relating to pop culture. His focus has been primarily on "zombies."[52] Bishop has also participated in numerous presentations with themes similar to his publications.[53] Bishop summarizes his work in the following way: "I have made a career of exploring what works of art say about the society that produces them."[54]

The defendants are correct. Nothing in Bishop's "knowledge, skill, experience, training, or education"[55] suggests he is qualified to testify regarding the question of "whether the

---

[46] *Id.*

[47] *Id.* at 4.

[48] Bishop Report at 12.

[49] *Id.* at 2.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 12–15.

[53] *Id.* at 15–18.

[54] *Id.* at 1.

[55] Fed. R. Evid. 702.

prohibition against serving alcohol while showing sexually explicit films is supported by the important government interest stated in the statute of reducing adverse secondary effects."[56] Any portion of his report and opinion that relates to this question is excluded.

Bishop would, however, be "qualified to opine regarding the tone, content and artistic value of *Deadpool*, and particularly, the comedic intent of the messages conveyed in" the relevant scenes to this litigation.[57]

### b.  Bishop's opinions related to value or obscenity are not reliable.

While Bishop may be qualified to opine "regarding the tone, content and artistic value of *Deadpool*," his opinion is not reliable. The statute at issue does not implicate the value of the film, or challenge its primary effect, but simply prohibits showing films portraying specified types of conduct. The conduct prohibited in films is consistent with live conduct that is prohibited on premises regulated by the Utah Alcoholic Beverage Commission.[58] No expert testimony is necessary to determine whether the film at issue violates the statutory standard.

Bishop's opinion on obscenity amounts to a review of *Deadpool* through the lens of *Miller v. California*'s definition of obscenity. As Bishop proceeds through an inventory of various scenes in *Deadpool*, he offers legal conclusions such as "I personally don't see how the lighthearted and humorous montage [of simulated sexual encounters] could possibly appeal to a prurient interest."[59] Bishop comes to these personal opinions stated in legal terms without employing an "empirical test";[60] without any indication that his "theory or technique" has or, as

---

[56] Defendants' Reply at 2.

[57] Opposition at 2.

[58] Utah Code Ann. §32B-1-504(2)and (3).

[59] Bishop Report at 6–7.

[60] *Daubert*, 509 U.S. at 593.

it now stands, even could be "subjected to peer review";[61] and without any indication that his

exegesis is a generally acceptable[62] way of determining obscenity.

Determining whether a work is obscene is necessarily a soft analysis, but even if the

question of obscenity were relevant, the finder of fact would need a great deal more than what

Bishop provided. A central question would be whether *Deadpool* was obscene as defined by

contemporary community standards.[63] And the fact finder would need to know what metrics the

expert employed to determine those standards. Bishop does not provide any of this in his report.

Therefore, Bishop's opinion and report is excluded. It is not reliable.

**2.  Parker's report and opinion is excluded in part.**

Parker offers opinions in two areas: "Crime report and assessed valuation data were used

as indicators of possible Brewvies negative secondary effects." [64] Defendants attack Parker and

his opinion on various fronts. They argue that Parker is not qualified to opine on secondary

effects[65] and that his opinion is not reliable because of the type and poor quality of data he relies

on.[66]

Cinema Pub responds that "Mr. Parker is well-qualified as a certified urban planner, and

he performed an actual field study using accepted methodology in his profession."[67] Regarding

the data he used, Cinema Pub argues that Parker "gathered and analyzed all available data from

---

[61] *Id.*

[62] *Id.* at 594.

[63] Admissibility of Expert or Opinion Evidence—Supreme Court Cases § 32, 177 A.L.R. Fed. 77 (2002).

[64] Parker Report at 6, docket no. 36-3, filed October 31, 2016.

[65] Defendants' Motion at 6.

[66] *Id.* at 7–8.

[67] Cinema Pub's Opposition at 7.

primary sources on the traditionally specified factors that have been the basis for finding adverse secondary effects."[68]

    **a.  Parker is qualified to testify regarding secondary effects.**

Parker is the "Principal of Planning and Development LLC," which is a "planning consultancy firm."[69] Parker "hold[s] a Bachelors of Urban and Regional Planning (Honors) degree from the University of New England and a Masters of City and Metropolitan Planning degree from the University of Utah."[70] He is currently "a doctoral student at the University of Utah pursuing the degree of Doctor of Metropolitan Planning, Policy and Design."[71] He is an adjunct professor at the University of Utah where he teaches "Undergraduate and graduate students in the courses of Urban Ecology Internship, Professional Planning Internship, Metropolitan and Regional Planning, and Small Town and Resort Planning."[72] Parker is a member of the American Planning Association and a "certified planner with the American Institute of Certified Planners."[73] To maintain that certification he must "earn a specified number of continuing education credits that include courses in planning ethics."

Though Parker apparently needed to research the meaning of secondary effects,[74] because Parker did not know "secondary effects" in this legal context could include "crime, negative impacts on property values, and blight/noise," does not mean he is not expert in determining

---

[68] *Id.* at 6.

[69] Parker Report at 1.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.* at 7.

whether a particular business had those secondary effects on a neighborhood. Once he understood the vocabulary, he could apply his professional skills.

Parker's "knowledge, skill, experience, training, [and] education" are sufficient to qualify him to testify about secondary property valuation and crime effects of Brewvies showing movies that violate Utah Code Ann. 32B-1-504(7) in the delimited area.

### b. Parker's report is not reliable.

Parker relied on "crime report data . . . limited to the three months of July 1 to October 1, 2016 by Salt Lake City's CrimeReports."[75] For property valuation Parker retrieved "the assessed and building valuations for the years 2012 and 2016 for the Wang Organization parcel [where Brewvies is located], and the adjacent parcels within 300 feet." [76] He obtained records from the Salt Lake County Assessor's Office.

Parker wanted "to reveal any evidences of negative secondary effects attributable to Brewvies serving alcoholic beverages to customers and screening movies which may violate Utah Code §32B-1-504(7), but which are screened in other movie theaters in Utah and nationally."[77] That would be relevant. But his report does not correlate the showing of movies that *violate* the statute with secondary effects. Nowhere does he discuss movie content during the reported time periods or relate it to his findings. Parker actually "conducted a study to identify any negative secondary effects attributable to Brewvies."[78] But Brewvies' business model is not at issue. This case is about the validity of the prohibition in Utah Code Ann. §32B-1-504(7).

---

[75] *Id.* at 8–9.

[76] *Id.* at 14.

[77] Parker Report at 7.

[78] Parker Report at 6.

Therefore, Parker's report related to the secondary effects on real estate valuation and crime from showing movies while alcohol is consumed is excluded.

**3. George's testimony is not excluded.**

Cinema Pub argues that George's report and opinion[79] should be excluded because he is unqualified:

> Dr. George has never been to Brewvies, never performed any studies relating to alcohol outside of a laboratory setting, never performed any studies, in the field or in the laboratory, of combining alcohol with viewing mainstream "R" rated movies, and never performed any studies, in the field or in the laboratory, relating to any possible secondary effects from watching mainstream movies in traditional theaters that sell alcohol, and has never provided expert testimony outside the context of statutes addressing sexually oriented businesses.[80]

Cinema Pub also argues that George's report and opinion should be excluded because his methodology was unreliable: "Dr. George's failure to base his opinions on facts and data is evident in his repeated failure to provide an evidentiary basis for many of his assertions."[81]

Finally, Cinema Pub argues that George's report and opinion should be excluded because they are "not sufficiently relevant under the 'fitness prong' under *Daubert*."[82]

The defendants respond that George is "uniquely qualified to opine regarding the likely results and potential risks of combining alcohol and sexually explicit films."[83] Indeed, defendants argue, Cinema Pub's expert witness Linz reported that George is "the leading authority on the potentially dishibiting [sic] effects of alcohol on sexual perception and aggression."[84] Defendants argue that even if the alleged sexually explicit images in *Deadpool* are

---

[79] Expert Report of William H. George, Ph.D., [docket no. 37-1](#), filed October 31, 2016.

[80] Cinema Pub's Motion at 6.

[81] *Id.* at 8.

[82] *Id.* at 9.

[83] Defendants' Opposition at 2.

[84] *Id.*

less explicit than what George has used in his clinical studies, "such a determination is not grounds to disqualify Dr. George. A perfect match between the case's subject matter and the expert's science are not required, only that the subject matter of the case is 'closely related' to the expert's particular science."[85] And here, the subject matter is actually not *Deadpool* but films violating the statute. Defendants argue that George's methods were reliable and his opinions are relevant.[86]

    **a.   George is qualified to testify regarding relevant secondary effects.**

George is qualified to offer opinions in this case. He "is currently Professor of Psychology and Adjunct Professor of American Ethnic Studies at the University of Washington (UW) in Seattle."[87] After completing his Ph.D., George did a Clinical Psychology Internship and Postdoctoral Fellowship in Addictions.[88] George has been directly or indirectly involved in research regarding the secondary effects of alcohol throughout his career.[89]

George's failure to go to *Brewvies* does not disqualify his opinion. As the Court stated in *Daubert* "[u]nlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."[90] And limiting his research to "deviant pornography" does not disqualify George's opinion. George's research still relates to the general question of whether consuming alcohol while viewing sexually suggestive material has negative secondary effects.[91] If George's failure to test tamer sexual displays

---

[85] *Id.* at 3.

[86] *Id.* at 6–8.

[87] Expert Report of William H. George, Ph.D. at 1, docket no. 37-1, filed October 31, 2016.

[88] *Id.*

[89] *Id.* at 1; *see also* Vita William H. George Professor of Psychology (Vita), docket no. 37-2, filed October 31, 2016.

[90] Daubert, 509 U.S. at 592.

[91] *See* Vita at 8–35.

seriously undermines his opinion, then that is better left to cross-examination: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[92]

### b.  George's methods are reliable.

Cinema Pub makes very similar arguments for excluding George's opinion for not being reliable. That is, Cinema Pub argues that George's testimony should be excluded because he did not base his conclusions on independent research specifically for this case.

George has seen *Deadpool*.[93] Though his opinion, as Cinema Pub argues, may be "couched in an abstract theoretical spectrum,"[94] it is reliable and useful for a fact finder attempting to evaluate whether the statutory prohibition on certain film content has justifying secondary effects. Cinema Pub, as defendants rightly point out,[95] fails to undermine George's points using the traditional metrics of reliability. George's impressive credentials belie Cinema Pub's concerns. George's methods and research appear to have undergone significant peer review. If there are any questions regarding the opinions' and method's reliability, those can be developed in cross-examination.

### c.  George's opinions are relevant.

George's opinion on whether there are negative secondary effects from viewing explicit material while consuming alcohol is relevant. Those effects may be at the heart of this litigation. And again, Cinema Pub's argument that the opinions are not relevant because "George . . .

---

[92] *See Id.* at 596.

[93] George Report at 2.

[94] Cinema Pub's Motion at 9.

[95] Defendants' Opposition at 6–7.

couches all of his opinions under a 'can it' possibility"[96] is better worked out in cross examination.

### 4. Linz's supplemental report is excluded.

Finally, defendants argue that Linz's supplemental report[97] should be excluded because "it revises previous reports, materially alters his opinions, and offers entirely new opinions or information."[98] Cinema Pub admits that Linz's supplemental report "contains . . . one substantive addition to the initially disclosed expert report."[99]

Federal Rule of Civil Procedure 26(e) states that an expert has a duty to supplement a report. "[T]he party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."[100] Supplementation "under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure."[101]

Linz's supplemental report was submitted six months before the pretrial disclosures were due. Yet the supplemental report goes well beyond "correcting inaccuracies" or "filling the interstices of an incomplete report based on information that was not available" when he submitted his original report.[102] For example, the report includes an extended discussion in

---

[96] Cinema Pub's Motion at 10.

[97] Supplemental Report by Daniel Linz, PhD, docket no. 43-1, filed December 30, 2016.

[98] Defendants' Motion at 9.

[99] Cinema Pub's Opposition at 7.

[100] Fed. R. Civ. P. 26(e)

[101] *Luke v. Family Care and Urgent Medical Clinics*, 323 Fed. Appx. 496, 500 (9th Cir. 2009) (internal quotation marks omitted).

[102] *Id.*

which Linz draws numerous legal conclusions. He states, "My reading of the statute suggests that it is so overbroad that it would prohibit the showing of the majority of the mainstream, often critically acclaimed and award-winning films that have been screened over the past several years at the Brewvies location."[103] And then continues by going through a list of films that he argues would be captured by this "overbroad" and "vague" statute.[104]

With few exceptions, this material was available to Linz when he submitted his original report. And, as the defendants properly point out,[105] "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."[106]

Therefore, Linz's supplemental report is excluded.

---

[103] Supplemental Report by Daniel Linz, PhD at 1, docket no. 43-1, filed December 30, 2016.

[104] *Id.* ¶ 18, at 7.

[105] Defendants' Reply at 5.

[106] *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1329 (10th Cir. 1998).

**ORDER**

IT IS HEREBY ORDERED that Defendants' Motion to Exclude Expert Opinions and Supporting Memorandum[107] is GRANTED. Bishop's opinion and report is excluded; Parker's opinion and report is excluded; and Linz's supplemental report is excluded.

IT IS FURTHER ORDERED that Plaintiff's Motion to Exclude the Expert Testimony of Dr. William George[108] is DENIED.

Signed March 21, 2017.

BY THE COURT

District Judge David Nuffer

---

[107] Docket no. 44, filed January 27, 2017.

[108] Docket no. 45, filed January 27, 2017.