IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CINEMA PUB, LLC, d/b/a BREWVIES,<br><br>                    Plaintiff,<br>v.<br><br>SALVADOR D. PETILOS, Director; CADE MEIER, Deputy Director; NINA MCDERMOTT, Director of Compliance, Licensing Enforcement, Utah Department of Alcoholic Beverage Control, in their official capacities; JOHN T. NIELSEN, Chairman; JEFFREY WRIGHT; KATHLEEN MCCONKIE COLLINWOOD; OLIVIA VELA AGRAZ; STEVEN B. BATEMAN; S. NEAL BERUBE; AMANDA SMITH, Members, Utah Alcoholic Beverage Control Commission, in their official capacities,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER**<br>• **GRANTING [56] MOTION FOR SUMMARY JUDGMENT;**<br>• **DENYING [57] MOTION FOR SUMMARY JUDGMENT; AND**<br>• **FINDING MOOT [69] MOTION TO RECONSIDER**<br><br>Case No. 2:16-cv-00318-DN<br><br>District Judge David Nuffer |

Cinema Pub (Brewvies) is a mainstream movie theater that showed the movie *Deadpool*.

The defendants (collectively "the State") brought an administrative enforcement action against

Brewvies for violating subsection 7 of the Utah Code § 32B-1-504 (Section 7). In relevant part,

Section 32B-1-504 states:

> The following attire and conduct on premises or at an event regulated by the commission under this title are considered contrary to the public health, peace, safety, welfare, and morals, and are prohibited: . . . .
> (7) showing a film, still picture, electronic reproduction, or other visual reproduction depicting:
>> (a) an act or simulated act of:
>>> (i) sexual intercourse;
>>> (ii) masturbation;
>>> (iii) sodomy;
>>> (iv) bestiality;
>>> (v) oral copulation;
>>> (vi) flagellation; or

(vii) a sexual act that is prohibited by Utah law;
(b) a person being touched, caressed, or fondled on the breast, buttocks, anus, or genitals;
(c) a scene wherein an artificial device or inanimate object is employed to depict, or a drawing is employed to portray, an act prohibited by this section; or
(d) a scene wherein a person displays the genitals or anus.

Brewvies seeks declaratory and injunctive relief from the State's enforcement of Section 7.[1]

Brewvies (Brewvies Motion) and the State (State Motion) both move for summary judgment.[2] Both respond in opposition to the other's motion.[3] And both reply in support of their own motion.[4] Additionally, Brewvies filed a motion to reconsider (Motion to Reconsider)[5] a memorandum decision and order that granted the State's motion to exclude some of Brewvies experts and denied Brewvies's motion to exclude the State's expert, Dr. George.[6] The State responded in opposition.[7] Brewvies replied in support of that motion.[8]

---

[1] Amended Verfied [sic] Complaint for Declaratory and Injunctive Relief (Complaint), docket no. 54, filed March 2, 2017.

[2] Motion for Summary Judgment Granting Permanent Injunction and Declaratory Relief and Supporting Memorandum (Brewvies Motion), docket no. 56, filed March 4, 2017; Defendants' Motion for Summary Judgment and Supporting Memorandum (State Motion), docket no. 57, filed March 6, 2017.

[3] Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Brewvies Opposition), docket no. 65, filed April 1, 2017; Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (State Opposition), docket no. 66, filed April 3, 2017.

[4] Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment Granting Permanent Injunction and Declaratory Relief (Brewvies Reply), docket no. 67, filed April 14, 2017; Reply Memorandum in Support of Defendants' Motion for Summary Judgment (State Reply), docket no. 68, filed April 17, 2017.

[5] Plaintiff's Motion for Reconsideration of Memorandum Decision and Order Granting Defendants' Motion to Exclude Expert opinions and Denying Plaintiff's Motion to Exclude Expert Testimony (Motion to Reconsider), docket no. 69, field April 22, 2017.

[6] Memorandum Decision and Order Granting [44] Defendants' Motion to Exclude Expert Opinions and Denying [45] Plaintiff's Motion to Exclude Expert Testimony, docket no. 62, filed March 21, 2017.

[7] Memorandum in Opposition to Plaintiff's Motion for Reconsideration (Opposition to Motion to Reconsider), docket no. 71, filed May 8, 2017.

[8] Reply Memorandum in Support of Plaintiff's Motion for Reconsideration of Memorandum Decision and order Granting Defendants' Motion to Exclude Expert Opinions and Denying Plaintiff's Motion to Exclude Expert Testimony, docket no. 73, filed May 20, 2017.

Generally, the State argues that Brewvies does not have a constitutional right to serve beer while showing movies. Brewvies argues that Section 7 is a content-based restriction on speech that fails strict scrutiny.

Section 7 is a content-based law. And assuming the State has a compelling interest, it fails to show that Section 7 is the least restrictive means to further that interest. Therefore, the State Motion is DENIED and Brewvies Motion is GRANTED. The Motion to Reconsider is MOOT.

**Table of Contents**

Preliminary Issues ......................................................................................................... 3
    1.    Brewvies made an as-applied challenge and a facial challenge. ........................... 3
    2.    Because secondary effects are irrelevant, the Motion to Reconsider is moot. ....... 5
Undisputed Facts ........................................................................................................... 5
Standard of Review ...................................................................................................... 11
Discussion .................................................................................................................... 11
    1.    Section 7 regulates protected speech. ................................................................ 12
    2.    Strict scrutiny applies to Section 7. ................................................................... 13
        a.    The secondary effects doctrine does not apply to Brewvies. .................... 15
        b.    Because it is not clear whether *Reed* abrogated the secondary effects
            doctrine, *Reed* should be applied narrowly. ............................................. 18
        c.    It is not necessary to consider the difference between secondary and
            primary effects. ......................................................................................... 20
    3.    Section 7 fails strict scrutiny. ........................................................................... 20
Order ........................................................................................................................... 27

**PRELIMINARY ISSUES**

**1.  Brewvies made an as-applied challenge and a facial challenge.**

The State argues that Brewvies's Complaint is limited to an as-applied challenge of Section 7. The State also argues that Brewvies "did not plead [a facial challenge] in its Complaint" and that Cinema Pub did not "request relief congruent with a facial challenge."[9]

---

[9] State Reply at 9.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[10] This statement must give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."[11] However, when a statute is challenged as unconstitutional, determining whether the plaintiff has pleaded either an as-applied or facial challenge depends on the potential remedies. If the potential remedies implicate both types of challenges, the defendant has been given sufficient notice that both challenges are in play.

> [T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.[12]

And even if the plaintiff thinks it only makes an as-applied challenge, "no general categorical line bars a court from making broader pronouncements of invalidity."[13] "The label is not what matters."[14]

Brewvies's first and only claim for relief seeks declaratory and injunctive relief against past, present, and future enforcement of Section 7.[15] The potential remedies (declaratory and injunctive relief) for that claim therefore include both types of challenges because past and present enforcement springs from the application of the law, while a challenge to future enforcement attacks all applications of the statute. Therefore, the State had fair notice that Brewvies was bringing a facial challenge in addition to the as-applied challenge.

---

[10] Fed. R. Civ. P. 8(a)(2).

[11] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[12] *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 331 (2010).

[13] *Id.*

[14] *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

[15] Complaint ¶¶ 20–25.

**2. Because secondary effects are irrelevant, the Motion to Reconsider is moot.**

Though Brewvies argued convincingly that the prior order excluding Mr. Parker's opinion relating to secondary effects was incorrectly decided,[16] it is not necessary to reconsider the order. As discussed below,[17] the secondary effects doctrine is not relevant. Therefore, it is not necessary to revisit whether Mr. Parker's or Dr. George's opinions should or should not be excluded. The Motion to Reconsider is MOOT.

## UNDISPUTED FACTS[18]

1.    Brewvies shows only mainstream movies to its customers—movies rated from G to R by the Motion Picture Association of America. Also, rarely, Brewvies shows documentary films, or ski, outdoor, or skateboarding films, which are not rated and that are not in any way pornographic or obscene.[19]

2.    Brewvies's business model is to serve food and drinks, including alcoholic drinks, soft drinks, and water, and to have customers be able to enjoy their food and drinks while watching movies. The two theaters operated by Brewvies are designed and constructed so there is a level plank that runs in front of every row of seats, where customers can set their food and drinks while watching movies. Brewvies also holds special events, such as fund-raisers. The business of Brewvies is selling food and beverages to its customers and providing mainstream movies.[20]

---

[16] Motion to Reconsider at 4–13.

[17] *See* Discussion Section 2.

[18] The Undisputed Facts are drawn from the briefing, generally without alteration. Some facts listed in the parties' briefing are omitted for relevance. And some are altered to remove characterization or other legal or factual glosses.

[19] Brewvies Motion at 16; State Opposition at ix–x. The State does not dispute the facts in this paragraph. It only states that these facts are not relevant. This does not create a genuine dispute. Subsequent paragraphs drawing relevance objections will be deemed "undisputed."

[20] Brewvies Motion at 16–17 (undisputed).

3.     Brewvies has a business license as a motion picture theater with Salt Lake City and as a social club with the State of Utah Department of Alcoholic Beverage Control.[21]

4.     Brewvies has never had live nude or live semi-nude dancers, nor does it specialize or focus on movies with sexual content.[22]

5.     Brewvies is not a business that focuses on sex. Rather, it shows movies that other mainstream theaters show, the only difference being that Brewvies serves food (beyond the usual theater fare of popcorn and candy) and beverages that include alcoholic drinks.[23]

6.     The movie *Deadpool*—which was the target of an investigation by three undercover police officers with the Utah State Bureau of Investigation and the subject of a Notice of Agency Action and a Division of Alcoholic and Beverage Control (DABC) threat of a fine and the possible suspension or termination of Brewvies's liquor license—is a critically acclaimed film starring Ryan Reynolds and distributed by Fox. As of March 20, 2016, *Deadpool* had grossed over $731 million worldwide, making it the highest grossing R-rated movie in the history of film. At its height, it was playing in 3,856 movie theaters in the United States. As of April 15, 2016, *Deadpool* was still showing in at least seven movie theaters in Northern Utah. On May 6, 2016, after the filing of this lawsuit, Brewvies held a midnight showing of *Deadpool* at a "First Amendment Celebration" and, because it was over capacity, had to turn away approximately 200 people.[24]

7.     Licensing agreements, pursuant to which Brewvies shows films, forbid Brewvies from making alterations or cuts of any kind to the films it shows. For instance, a licensing

---

[21] *Id.* at 17 (undisputed).

[22] *Id.* at 18 (undisputed).

[23] *Id.* (undisputed).

[24] *Id.* at 18–19 (undisputed).

agreement with Sony Pictures Classics, Inc. ("SPC") provides as follows: "The Film, including any trailers or rolling track SPC (or its agent) attaches to the Film, shall be exhibited on the Screen during consecutive days during Exhibitor's normal operating hours. *Such exhibition shall be without any cuts or alterations of any kind* and without interruption, except what is necessary for theater maintenance and entrance and exit of patrons."[25]

8.      It would take significant time and resources for Brewvies to review in advance a film for possible violations of Subsection 7.[26]

9.      In 2011, the DABC informed Brewvies of potential agency action because Brewvies showed the R-rated movie *The Hangover Part II*, which violated Subsection 7. For various reasons, Brewvies agreed to pay a fine of $1,627.[27]

10.      On July 1, 2015, a DABC representative, Defendant Margaret Hardie, wrote an email to Brewvies owner Randall Miller informing him of potential agency action for showing "at least" two movies that "would not be allowed to be shown in your theater due to nudity and sexual content." The only films being shown at Brewvies at that time were *Magic Mike XXL* and *Ted* 2, neither of which were alleged to have been obscene. The DABC representative wrote: "Please make sure you preview all movies you will be showing. This ensures we can keep you from citations or law enforcement referring you for violations against your liquor license."[28]

11.      After Brewvies was sanctioned by the DABC for screening *The Hangover Part II*, legal counsel to the DABC, Sheila Page, suggested that Brewvies could simply give up its liquor license and show movies without allowing customers to drink alcoholic beverages while

---

[25] *Id.* at 25 (undisputed).

[26] *Id.* at 26 (undisputed).

[27] *Id.* (undisputed).

[28] *Id.* at 26–27 (undisputed).

watching movies. In a letter to Brewvies's former counsel, Ms. Page stated: "Brewvies has chosen to meld the serving of alcohol and the showing of films. The management has the option of being a motion picture theater *without* alcohol service." Ms. Page also said that Brewvies's "recourse if they do not wish to conform to the current law is to approach the legislature about changing the statute" and that she "would certainly encourage Brewvies to take the advice of DABC compliance officers to screen films for possible illegal conduct." [29]

12.     Between February 12, 2016, and March 24, 2016, Brewvies showed the movie *Deadpool* on one of its screens. A friend of Sheila Page, the attorney at the Attorney General's Office who represents the DABC in enforcement proceedings, mentioned to Ms. Page that Brewvies was showing *Deadpool*. Once Ms. Page received the information from her friend, she sent an email to Defendant Margaret Hardie, who has been the DABC Compliance Officer assigned to Brewvies since 2014. In her email to Ms. Hardie, dated February 22, 2016, Ms. Page wrote: "I hate to bring this up, but it is just too blatant to ignore. Brewvies is showing Deadpool. The reviews describe explicit sex scenes and male and female frontal nudity. I know some people who have seen it, and they confirm that it is very raunchy amid the bloody violence. Perhaps you should refer it to [the State Bureau of Investigation]." That email, which was the only complaint received by the DABC about Brewvies showing *Deadpool*, triggered a referral to the State Bureau of Investigation. [30]

13.     Three undercover officers with the State Bureau of Investigation went to Brewvies on February 26, 2016, to watch the movie and report whether they believed there were

---

[29] *Id.* at 27 (undisputed) (emphasis in original).

[30] *Id.* at 28 (undisputed).

violations of the law. Two of those officers have seen *Deadpool* on their own and one, Sean

Cannon, had seen it twice before he saw it at Brewvies.[31]

14.     Officer Cannon submitted his written report, which described that in the movie a

man, Wade, and woman, Vanessa, got into a relationship and had "implied sexual contact during

numerous holidays." He said Vanessa sodomized Wade in their bed. He also described Wade

getting into a fight, during which his clothes came off and he "shows full frontal nudity during

the fight scene." Later there was a scene that "showed him simulating him [sic] masturbating in

his bed with a stuff [sic] animal (Unicorn)." Later, there was full frontal nudity of women

dancing at a strip club, where Wade had gone to speak with Vanessa.[32]

15.     Officer Bullock, also with the State Bureau of Investigation, joined with the other

two undercover officers to investigate the showing of *Deadpool* because it might have been in

violation of Utah law. He had seen *Deadpool* twice, once as an investigator at Brewvies and once

"personally" at another theater.[33]

16.     Officer Bullock's report describes certain scenes of the movie in terms of the

prohibitions of Subsection 7. For instance, he states that the male and female characters were

"shown numerous times engaging in acts or simulated acts of sexual intercourse" and that the

male character "is shown on his back under bed sheets briefly engaged in masturbation or

simulated masturbation using a stuffed unicorn toy." He also describes a scene where the woman

was wearing a leather bikini, with an imagined strap-on penis "that isn't shown," and "has her

groin area pressed against the man's posterior," and she tells him to relax as he is sweating and

grimacing. She then bends down and says, "Happy Women's Rights Day" during what Officer

---

[31] *Id.* at 28–29 (undisputed).

[32] *Id.* at 29 (undisputed).

[33] *Id.* at 29–30 (undisputed).

Bullock calls "the sodomy or simulated sodomy scene." Officer Bullock also says that during

one sex scene, the male character fondled the woman's bare breasts and, finally, during the

credits, Officer Bullock describes "a drawing of the main character (male) . . . 'as he rides on the

back of a unicorn, he rubs its horn briefly until the horn shoots out rainbows (simulating

orgasm)."[34]

17.     After the investigative report was received from the State Bureau of Investigation,

a determination was made that if there were a violation of Subsection 7, it would "be classified

as a grave violation which would trigger penalties of fines or suspensions," so a Notice of

Agency Action was sent, and the matter was turned over by the DABC to the Attorney General's

Office.[35]

18.     On April 11, 2016, Brewvies received a Notice of Agency Action ("Notice")

signed by Defendant Nina McDermott on behalf of the DABC. The Notice alleged that Brewvies

had violated Utah's alcoholic beverage control laws as follows: "On or about February 23, 2016,

Brewvies, a social club, showed a film, electronic reproduction, or other visual reproduction

depicting: (1) an act or simulated act of sodomy, bestiality, or oral copulation, and (2) a scene

wherein a person displayed their genitals in violation of Utah Code Section 32B-1-504(7)(a) and

(d)."[36]

19.     The Notice states that Brewvies faces a penalty of a "10 day license suspension up

to a revocation of its club license and/or a $1,000 TO $25,000 fine." It also states the DABC is

seeking administrative hearing costs.[37]

---

[34] *Id.* at 30–31 (undisputed).

[35] *Id.* at 31 (undisputed).

[36] *Id.* at 32 (undisputed).

[37] *Id.* (undisputed).

20.     The Defendant Commissioners of the Utah Alcoholic Beverage Control
Commission have rule-making and supervisory responsibilities relative to the enforcement of
Subsection 7 and make the ultimate decisions regarding enforcement and sanctions for violations
of that statute.[38]

21.     Hundreds of Utah liquor licensees provide televisions for their customers to
watch.[39]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."[40] A factual dispute is genuine when "there is
sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[41] In
determining whether there is a genuine dispute as to material fact, the court should "view the factual
record and draw all reasonable inferences therefrom most favorably to the nonmovant."[42]

The moving party "bears the initial burden of making a prima facie demonstration of the
absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[43]

## DISCUSSION

The First Amendment, which applies to government action at all levels,[44] affords basic
but fundamental protections. It states that the government "shall make no law . . . abridging the

---

[38] *Id.* at 32–33 (undisputed).

[39] *Id.* at 33; State Opposition at xxx. The State does not create a genuine dispute of fact.

[40] Fed. R. Civ. P. 56(a).

[41] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[42] *Id.*

[43] *Id.* at 670–71.

[44] *See Everson v. Board of Ed. of Ewing Tp.*, 330 U.S. 1, 5 (1947) ("This is alleged to be a use of State power to
support church schools contrary to the prohibition of the First Amendment which the Fourteenth Amendment made
applicable to the states.").

freedom of speech."[45] The courts have construed this provision as broadly as it reads, protecting almost all forms of communication. Offensive and disturbing speech are protected, along with political debate, news media, and every day communication. The analytical framework for challenges under this clause is generally two-part.[46] First, it is determined if the law regulates speech protected by the First Amendment.[47] And second—if the law regulates protected speech—it is determined if the law satisfies the requisite level of scrutiny.[48]

### 1. Section 7 regulates protected speech.

Brewvies argues that *Deadpool* and the other "mainstream" movies it shows are "constitutionally protected" speech.[49]

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."[50] Motion pictures fall within its ambit: "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments."[51]

There are, however, "well-defined and narrowly limited classes of speech" that the First Amendment does not protect.[52] These are the so-called exceptions to the general presumption that the speech is protected. The five exceptions are:

---

[45] U.S. Const. amend. I.

[46] Unless the law applies to government-owned property. In which case, the court must also do a forum analysis. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 797 (1985).

[47] *Cornelius*, 473 U.S. at 797.

[48] *Id.*

[49] Brewvies Motion at 49.

[50] *U.S. v. Stevens*, 559 U.S. 460, 468 (2010).

[51] *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952). *See also Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee.").

[52] *Stevens*, 559 U.S. at 468–69 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)).

- obscenity;[53]
- defamation;[54]
- fraud;[55]
- incitement;[56] and
- speech integral to criminal conduct.[57]

In the pleadings and summary judgment related papers, the State does not argue any exception applies. Regarding *Deadpool* specifically, the State delineates its position: "Defendants do not argue that the images in *Deadpool* are obscene as the term has been defined by the courts. Neither do Defendants argue that *Deadpool* is pornography."[58]

Generally, Section 7 necessarily includes material within the full protective force of the First Amendment. The State does not contend that the acts listed in Section 7 correspond with any exception listed above. Presumably, something obscene[59] would violate Section 7, but something (*e.g.*, *Deadpool*) that violates Section 7 would not necessarily be obscene.

Section 7, therefore, acts against a broad swath of speech. Section 7, as applied by the State, regulates *Deadpool*, which is protected speech. Facially, Section 7 regulates both protected and unprotected speech.

## 2. Strict scrutiny applies to Section 7.

Because Section 7 regulates protected speech, the question is whether the State can justify the infringement under the relevant test. There are three tests, all characterized as a level

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] Defendants' Motion to Exclude Expert Opinions and Supporting Memorandum at 5, docket no. 44, filed January 27, 2017.

[59] *See Roth v. U.S.*, 354 U.S. 476, 487 (1957) ("Obscene material is material which deals with sex in a manner appealing to prurient interest.").

of scrutiny: strict scrutiny, intermediate scrutiny, or rational basis review. On the two ends, strict scrutiny is the most demanding standard and rational basis the least.[60] Brewvies argues that Section 7 should be subject to strict scrutiny.[61] The State argues that a less exacting intermediate scrutiny test applies because the purpose of Section 7 was to avoid negative secondary effects.[62] The Supreme Court has stated that a content-based law may be subjected to lower scrutiny if the legislature's purpose in enacting the law was not aimed at the content, "but rather at the secondary effects [of that content] on the surrounding community, namely, at crime rates, property values, and at the quality of the city's neighborhoods."[63]

Brewvies makes numerous supporting arguments why strict scrutiny should apply. First, Brewvies argues that strict scrutiny should apply because the secondary effects doctrine has only been applied to a narrow class of businesses into which it does not fall.[64]

Second, Brewvies argues that *Reed v. Town of Gilbert, Arizona*,[65] a recent Supreme Court opinion, prevents courts from considering any motivating factor, such as reducing secondary effects, to reduce scrutiny of a content-based statute to intermediate.

Third, Brewvies argues that the secondary effects doctrine should not apply because the effects resulting from viewing the content Section 7 targets, and to which the State's supporting expert testimony relates, is primary, not secondary effects. The difference between secondary and primary effects is relevant because "the lesser scrutiny afforded regulations targeting the

---

[60] *City of Renton v. Playtime Theatres Inc.*, 475 U.S. 41, 46–51 (1986).

[61] Brewvies Motion at 51–52.

[62] State Motion at 1–3.

[63] *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002).

[64] Brewvies Motion at 60–62.

[65] 135 S.Ct. 2218 (2015).

secondary effects of crime or declining property values ha[s] no application to content-based regulations targeting the primary effects of protected speech."[66]

Brewvies is correct. Though there may be merit to each of Brewvies's arguments, Section 7 is subject to strict scrutiny because the secondary effects doctrine has only been applied to "regulations affecting physical purveyors of adult sexually explicit content."[67] Brewvies does not meet that description because it occasionally shows films that occasionally have sexual content, and it is not primarily a business centered on explicit sexual activity.

### a.  The secondary effects doctrine does not apply to Brewvies.

In *Free Speech Coalition, Inc. v. Attorney General United States*,[68] the Third Circuit reviewed the various contexts in which the Supreme Court has applied the secondary effects doctrine and cautioned courts to avoid "expanding its [the secondary effect doctrine] application beyond the only context to which the Supreme Court has ever applied it: regulations affecting physical purveyors of adult sexually explicit content."[69]

Specifically, the Supreme Court has applied the secondary effects doctrine to the adult oriented movie theater in *City of Renton*, which attempted to show "feature-length adult films" that could be characterized "by an emphasis on matter depicting, describing or relating to" explicit sexual activities.[70] The Supreme Court applied the doctrine to the erotic dancing establishment in *City of Erie v. Pap's A.M.*,[71] which attempted to have "totally nude erotic

---

[66] *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815 (2000).

[67] *Free Speech Coalition, Inc. v. Attorney General United States*, 825 F.3d 149, 161 (3d Cir. 2016).

[68] 825 F.3d 149 (3d Cir. 2016).

[69] *Id.* at 161.

[70] *City of Renton*, 475 U.S. at 44.

[71] 529 U.S. 277 (2000).

dancing performed by women."[72] And finally, in *City of Los Angeles v. Alameda Books, Inc.*,[73] the Supreme Court held that the city of Los Angeles could prevent multiple adult oriented establishments from concentrating in one location in order to avoid negative secondary effects.

Brewvies is not an adult oriented establishment. Brewvies is no Playtime Theater.[74] It is not the Pussy Cat.[75] Nor Kandyland,[76] or Teasers,[77] or the Cajun Club,[78] or Angels Sports Bar.[79] Brewvies does not focus on sex.[80] It shows the same movies that other, non-sexually oriented movie theaters show but with alcohol.[81] It is not a statutorily defined sexually oriented business.[82]

The State does not argue that Brewvies is an adult sexually oriented establishment.[83] Instead, it argues that if at any given point the content of an offending film is analogous to the content of the adult films at issue in *Renton*, the secondary effects doctrine applies.[84] But the secondary effects doctrine was not intended to protect neighborhoods from the effects of momentary, episodic sexual displays that the enforcing agency does not consider obscene or

---

[72] *Id.* at 284.

[73] 535 U.S. 425 (2002).

[74] *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).

[75] *Young v. American Mini Theatres*, 427 U.S. 50 (1976).

[76] *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000).

[77] *Gary v. City of Warner Robins, Georgia*, 311 F.3d 1334 (11th Cir. 2002).

[78] *G.M. Enterprises, Inc. v. Town of St. Joseph, Wisconsin*, 350 F.3d 631 (7th Cir. 2003).

[79] *Department of Alcoholic Beverages Control v. Alcoholic Beverage Control Appeals Bd.*, 99 Cal. App. 4th 880 (Cal. Ct. App. 2002).

[80] Undisputed Facts ¶ 5.

[81] *Id.*

[82] *See, e.g.*, Utah Code 1953 § 10-8-41.5(1)(f)(i) ("'Sexually oriented business' means a business at which any nude or partially denuded individual, regardless of whether the nude or partially denuded individual is an employee of the sexually oriented business or an independent contractor, performs any service for compensation.").

[83] Undisputed Facts ¶¶ 4–5.

[84] State Reply at 7.

pornographic. It was intended to protect neighborhoods from the harmful effects of speech on the fringes of First Amendment protection that defines a specific class of businesses, *i.e.*, sexually oriented businesses.

Additionally, the secondary effects doctrine has been applied almost exclusively in cases involving zoning ordinances. The doctrine originated in a footnote of the Supreme Court's plurality decision in *Young v. American Mini Theatres, Inc.*[85] There the Court stated that the facially content-based zoning ordinance would be subject to intermediate scrutiny and not strict scrutiny because of the city's "interest in the present and future character of its neighborhoods."[86] In *City of Renton* the Court decided that the facially content-based zoning ordinance would be subject to intermediate and not strict scrutiny because of the city's interest in "preserving the quality of life in the community at large by preventing [adult] theaters from locating in other areas," which is "the essence of zoning."[87] And in *Alameda Books* the facially content-based law was subject to intermediate and not strict scrutiny because of the city's interest in avoiding a large concentration of adult-oriented businesses.

*City of Erie v. Pap's A.M.*[88] is the one case not involving a zoning ordinance where the Supreme Court applied the secondary effects doctrine. *City of Erie*, however, still involved a "physical purveyor[] of adult sexually explicit content."[89] Pap's A.M. "operated a nude dancing establishment in Erie."[90] Pap's challenged a public indecency ordinance. The Court held that "the ordinance prohibiting public nudity is aimed at combating crime and other negative

---

[85] 427 U.S. 50, 71 n.34 (1976).

[86] *Id.* at 72.

[87] *City of Renton*, 475 U.S. at 54.

[88] 529 U.S. 277 (2000).

[89] *Free Speech Coalition*, 825 F.3d at 161.

[90] *City of Erie*, 529 U.S. at 283.

secondary effects caused by the presence of adult entertainment establishments . . . and not at suppressing the erotic message conveyed by this type of nude dancing."[91] In dissent, Justice Stevens pointed out that this marked a departure from prior precedent: "[W]e have limited our secondary effects cases to zoning."[92]

The State does not argue that Section 7 is a zoning law.[93] Instead, the State argues that Section 7 is part of the State's larger scheme for regulating alcohol.[94] The State cannot argue that it has plenary power to control liquor licensing under the Twenty-first Amendment,[95] to the point of obliterating First Amendment rights. That argument has been unequivocally rejected by the Supreme Court.[96] And, as just discussed, the State's argument that, in effect, it has an interest in reducing *intermittent* secondary effects goes well beyond secondary effects case law. The secondary effects doctrine, therefore, will not reduce the level of scrutiny in this case. Section 7 will be reviewed under strict scrutiny.

     **b.  Because it is not clear whether *Reed* abrogated the secondary effects doctrine, *Reed* should be applied narrowly.**

In *Reed*, a case about sign placements, the Supreme Court stated that a law is content-based—thus subject to strict scrutiny—if "on its face [the law] draws distinctions based on the message a speaker conveys" or if it "cannot be justified without reference to the content of the regulated speech."[97] And later, "A law that is content based on its face is subject to strict scrutiny

---

[91] *Id.* at 291.

[92] *Id.* at 322 (Stevens J., dissenting).

[93] Opposition to Motion to Reconsider at 5.

[94] *Id.*

[95] State Motion at 3–4.

[96] *See 44 Liquormart, Inc. v. Rhode Island Liquor Stores Association*, 517 U.S. 484 (1996).

[97] *Reed*, 135 S.Ct. at 2227 (internal quotation marks omitted).

regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."[98]

Brewvies argues that after "*Reed* no 'content-neutral justification' (*e.g.*, 'secondary effects') can justify reducing the level of scrutiny."[99] In other words, according to Brewvies, under *Reed*, Section 7 is a content-based law regardless of the State's alleged "benign motive" of reducing or avoiding negative secondary effects.[100]

But the secondary effects doctrine remains good law. As the Eleventh Circuit stated, "There is no question that *Reed* has called into question the reasoning undergirding the secondary-effects doctrine."[101] Even so, *Reed* will not be applied here to eliminate consideration of the secondary effects doctrine. The secondary effects doctrine does not apply for the reasons already stated.[102] Until the Supreme Court expresses otherwise, *Reed* should be confined to laws governing signage. Though the secondary effects doctrine was mentioned in Justice Kagan's opinion concurring in the judgment, the majority in *Reed* did not address the doctrine. The Supreme Court usually does not overturn a long line of precedents *sub silentio*.[103]

---

[98] *Id.* at 2228.

[99] Brewvies Reply at 2.

[100] *Id.* at 1–2; Brewvies Opposition at 89–90.

[101] *Flanigan's Enterprises, Inc. of George et al. v. City of Sandy Springs, Georgia*, No. 16-14428, 2017 WL 3475481, at *5 (11th Cir. Aug. 14, 2017).

[102] *See supra* Discussion Section 2(a).

[103] *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.") *See also Free Speech Coalition Inc.*, 825 F.3d at 174 (Rendell, J., concurring) ("the Court has admonished that other courts cannot conclude that its more recent cases have, by *implication*, overruled an earlier precedent.") (internal quotation marks omitted) (alterations omitted) (emphasis added); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category the Court has said occupies the outer fringes of First Amendment protection.").

### c.  It is not necessary to consider the difference between secondary and primary effects.

Brewvies argues that Section 7 "is aimed at 'primary' effects."[104] And Brewvies argues that Dr. George (the State's expert on secondary effects), "focuses not on 'secondary effects,' but *solely* on the *primary* impacts of sexually explicit, pornographic *content* on those who see, hear, or read the content, and what *might* occur as a result of those *primary* impacts."[105]

The problem with the secondary effects doctrine, as one commentator described it, is a lack of clarity in its application:

> The Supreme Court has not explained the distinction between secondary and primary effects clearly or consistently, and there appears to be no single concept of secondary effects that can reconcile current law
> . . . .
> While various conceptions of secondary effects are implied in Supreme Court cases, no one of them can predict when the Court will apply the secondary effects doctrine or, alternatively, when it will apply strict scrutiny.[106]

Fortunately, it is not necessary to untie this Gordian knot. Because Section 7 will be considered under strict scrutiny,[107] the secondary effects doctrine is irrelevant.

### 3.  Section 7 fails strict scrutiny.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."[108] To be "narrowly tailored," the means for effectuating the compelling interest must be the "least restrictive means among available, effective alternatives."[109] Thus, it is the State's burden to demonstrate that

---

[104] Brewvies Motion at 13.

[105] Brewvies Opposition at 2 (emphasis in original).

[106] John Fee, *The Pornographic Secondary Effects Doctrine*, 60 Ala. L. Rev. 291, 306 (2009).

[107] *See infra* Discussion Section 3.

[108] *Reed*, 135 S.Ct. at 2231.

[109] *U.S. v. Alvarez*, 567 U.S. 709, 729 (2012).

Section 7's restrictions of Brewvies First Amendment rights is justified to serve a compelling interest and that it is the least restrictive means for accomplishing that interest. The State cannot do so.

The State offered only one governmental interest in support of Section 7's restrictions: avoiding potential negative secondary effects from combining sexually explicit images with alcohol.[110] Though this may be a compelling governmental interest, Section 7 is not the least restrictive means for accomplishing it. Section 7 is overinclusive.

A statute is overinclusive, and thus facially invalid, if there is a showing that the "law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep."[111] If the statute is found to be overinclusive it will "invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression."[112]

Section 7 is overinclusive because it captures mainstream content. The following cases demonstrate Section 7's shortcomings. In *Barnes v. Glen Theatre, Inc.*, Justice Souter discussed[113] how Indiana's public indecency law, which prohibited completely nude dancing, would be overinclusive:

> It is difficult to see, for example, how the enforcement of Indiana's statute against nudity in a production of "Hair" or "Equus" somewhere other than an "adult" theater would further the State's interest in avoiding harmful secondary effects, in

---

[110] State Motion at 4.

[111] *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal quotation marks omitted).

[112] *Id.* at 119 (internal quotation marks omitted) (emphasis in original).

[113] Courts have held that Justice Souter's concurrence is the binding precedent from *Barnes*. *See, e.g.*, *Farkas v. Miller*, 151 F.3d 900, 904 (8th Cir. 1998) ("We find that the opinion of Justice Souter presented the narrowest resolution of the issues in *Barnes*, as the plurality opinion is broad enough of to encompass the standard he articulated.").

the absence of evidence that expressive nudity outside the context of *Renton*-type adult entertainment was correlated with such secondary effects.[114]

In *Farkas v. Miller*,[115] the Eighth Circuit addressed a First Amendment challenge to Iowa's statute that prevented fully nude dancing. The statute included important limiting language: the statute "shall not apply to a theater, concert hall, art center, museum, or similar establishment which is primarily devoted to the arts or theatrical performances and in which any of the circumstances contained in this section were permitted or allowed as part of such art exhibits or performances."[116] The court determined that because of the limiting language the statute was not overinclusive:

> In this case, we find that the statute's exception for 'a theater, concert hall, art center, museum, or similar establishment . . . primarily devoted to the arts or theatrical performances' saves it from being overbroad. The statutory exception appropriately limits the reach of the restrictions to the type of adult entertainment that is associated with harmful secondary effects.[117]

In *Basiardanes v. City of Galveston*,[118] the Fifth Circuit addressed a zoning ordinance that banned the showing of "nonobscene but sexually oriented motion pictures at adult theaters with the City of Galveston."[119] Though much of the court's decision was later abrogated by *City of Renton*,[120] its overbreadth discussion remains good law. The court held that the ordinance was overbroad because it regulated "to the point of banning theaters regularly showing any film that, under Texas law, may not be viewed by minors who are unaccompanied by an adult."[121] The

---

[114] *Barnes*, 501 U.S. at 585 n.2.

[115] 151 F.3d 900 (8th Cir. 1998).

[116] *Id.* at 902.

[117] *Id.* at 905.

[118] 682 F.2d 1203 (5th Cir. 1982).

[119] *Id.* at 1207.

[120] *See Sarre v. City of New Orleans*, 420 Fed. App'x 371, 375 n.12 (5th Cir. 2011).

[121] *Basiardanes*, 682 F.2d at 1212–13.

court reasoned, "American theaters today commonly exhibit a broad range of films that may be unfit for children without in any way contributing to urban blight or promoting crime. Yet theaters showing these movies are subject to [the ordinance] to the same extent as an adult theater showing films on the fringe of the obscene."[122] The ordinance reached "many films that are far removed from what is colloquially termed 'hard core,' or even 'soft core,' pornography."[123] The court concluded, "It must be made totally clear that this ordinance, through the guise of regulation, banned theaters showing motion pictures that admittedly could be shown with complete legality to every person in Galveston seventeen years of age and over."[124]

By contrast, a carefully worded ordinance was upheld in *Baby Dolls Topless Saloons, Inc. v. City of Dallas, Tex.*[125] The Fifth Circuit considered a city ordinance that defined sexually oriented businesses to include "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center."[126] The ordinance defined an adult video store as "a commercial establishment that *as one of its principal business purposes* offers for sale or rental for any form of consideration any one of the following: . . . representation that depict or describe . . . '*specified anatomical areas*'"[127] It defined adult motion picture theater as "a commercial establishment where, for any form of consideration, films, motion pictures, video cassettes, slides, or similar photographic reproductions are *regularly shown* that are *characterized by* the

---

[122] *Id.* at 1217.

[123] *Id.* at 1216–17.

[124] *Id.* at 1217.

[125] 295 F.3d 471 (5th Cir. 2002).

[126] *Id.* at 477.

[127] *Id.* (emphasis in original).

depiction or description of . . . '*specified anatomical areas*.'" [128] And it defined "specified anatomical areas" to mean "any of the following, or any combination of the following, when less than completely and opaquely covered: (i) any human genitals, pubic region, or pubic hair; (ii) any buttock; or (iii) *any portion of the female breast or breasts that is situated below a point immediately above the top of the areola*." [129]

The plaintiffs argued that the ordinance was overbroad because "it will operate to classify a number of 'mainstream' businesses (movie theaters, video stores . . .) as [sexually oriented businesses] (adult motion picture theaters, adult video stores . . .)." [130] The court rejected the argument for two reasons. First, the court emphasized that in order to fall under the ordinance, the motion picture theater, for example, would have to be regularly characterized (*i.e.*, its "*essential* character or quality") as showing depictions of "specific anatomical areas." [131] Accordingly, the court reasoned, the "chance that 'mainstream' movie theaters will show films with depictions of [specific anatomical areas] *as their essential quality*, and will do so *regularly*, is highly improbable, as is the chance that they will be classified as 'adult' motion picture theaters" and thus sexually oriented businesses. [132] Section 7 has no requirement of "essential quality" or regularity.

Second, the Fifth Circuit looked at agency interpretation to avoid declaring that the statute was overbroad. That the statute was not overbroad "is confirmed by the limiting construction by the City Attorney post-enactment of the Ordinance and filing of this action. That

---

[128] *Id.* (emphasis in original).

[129] *Id.* at 477–78 (emphasis in original).

[130] *Id.* at 482.

[131] *Id*

[132] *Id.*

limiting construction provides that businesses 'which feature adult magazines, NC-17 or R-rated video tapes, and NC-17 or R-rated motion pictures', shall not be classified as [sexually oriented businesses] by virtue of their featuring such products."[133] We have no such agency interpretation but in fact an agency enforcement illustrating Section 7's overbreadth.

*Barnes*, *Farkas*, *Basiardanes*, and *Baby Dolls Topless Saloons* demonstrate that Section 7 "punishes a substantial amount of protected free speech."[134] In an effort to mitigate the secondary effects that allegedly result from the combination of alcohol and the occasional, momentary glimpse of nudity, Section 7 reaches "many films that are far removed from what is colloquially termed 'hard core,' or even 'soft core,' pornography."[135] The State admits this.[136] It makes no contention that *Deadpool* is pornography. The State only argues that *by analogy* short portions of *Deadpool* are like the films typically found in an adult theater.[137] Unlike the statute in *Baby Dolls Topless Saloons*, no language limits Section 7's application to those businesses that are characterized by regularly showing sexually explicit material, who make that their essential nature. The State has violated the First Amendment by bringing an administrative enforcement action against a mainstream motion picture theater showing an R-rated movie. That demonstrates the breadth of Section 7's reach. Section 7's restrictions impose unacceptable limitations on speech that the State admits should be accorded full First Amendment protection.[138]

---

[133] *Id.* at 483.

[134] *Virginia*, 539 U.S. at 118.

[135] *Basiardanes*, 682 F.2d at 1216–17.

[136] Defendants' Motion to Exclude Expert Opinions and Supporting Memorandum at 5, docket no. 44, filed January 27, 2017 ("Defendants do not argue that the images in *Deadpool* are obscene as the term has been defined by the courts. Neither do Defendants argue that *Deadpool* is pornography.").

[137] State Reply at 7.

[138] Undisputed Facts ¶¶ 4–5.

It is worth noting that Idaho's statute similar to Section 7[139] was amended to substantially narrow it scope[140] after a suit similar to this one was filed.[141]

Therefore, because Section 7 is not the least restrictive means for effectuating the State's interest, it fails strict scrutiny. Brewvies is entitled to declaratory and injunctive relief.

---

[139] Idaho Code § 23-614(1)(e) (2015) (making it a misdemeanor for a liquor licensee to serve alcohol and show "films, still pictures, electronic reproductions, or other visual reproductions" that depicted
      (i) Acts or simulated acts of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law.
      (ii) Any person being touched, caressed or fondled on the breast, buttocks, anus or genitals.
      (iii) Scenes wherein a person displays the vulva or the anus or the genitals.
      (iv) Scenes wherein artificial devices or inanimate objects are employed to portray any of the prohibited activities described in this section.

[140] Idaho Code § 23-614(1)(f) (2016) (it is unlawful for a liquor licensee to show "films, still pictures, electronic reproductions or other visual reproductions which are in violation of chapter 41, title 18, Idaho Code (indecency and obscenity), or are in violation of federal law regarding pornography, indecency or obscenity.").

[141] Verified Complaint and Demand for Jury Trial, docket no. 1 in Case 1:16-cv-00030-EJL, filed January 19, 2016.

**ORDER**

IT IS HEREBY ORDERED that the Motion for Summary Judgment Granting Permanent Injunction and Declaratory Relief and Supporting Memorandum[142] is GRANTED.

IT IS FURTHER HEREBY ORDERED that Defendants' Motion for Summary Judgment and Supporting Memorandum[143] is DENIED.

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion for Reconsideration of Memorandum Decision and Order Granting Defendants' Motion to Exclude Expert Opinions and Denying Plaintiff's Motion to Exclude Expert Testimony[144] is MOOT.

IT IS FURTHER HEREBY ORDERED that the parties shall meet and confer on the form of a proposed civil judgment stating the terms of the injunction and submit their agreed form or separate offered forms by September 15, 2017.

Signed August 31, 2017.

BY THE COURT

David Nuffer
United States District Judge

---

[142] Docket no. 56, filed March 4, 2017.

[143] Docket no. 57, filed March 6, 2017.

[144] Docket no. 69, filed April 22, 2017.